Estate of Anna C. Ewing, Deceased, William F. C. Ewing, Sherman Ewing, Gifford C. Ewing and Bayard Ewing, Executors v. Commissioner.
Estate of Anna C. Ewing v. Commissioner
Docket No. 16257.
United States Tax Court
1950 Tax Ct. Memo LEXIS 31; 9 T.C.M. (CCH) 1096; T.C.M. (RIA) 50296; November 28, 1950
James D. Ewing, Esq., and Lasater Terrell, Esq., 120 Broadway, New York, N. Y., for the petitioner. Conway Kitchen, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined an estate tax deficiency against the Estate of Anna C. Ewing, Deceased, in the amount of $265,959.05. In the Federal estate tax return, filed on behalf of the Estate, 125 shares of Alexander Smith & Sons Carpet Co., hereinafter referred to as Smith Company, were valued at $300,000 or $2,400 per share (including accompanying scrip). Respondent determined in his notice of deficiency that the fair market value of the stock (including the scrip) on May 4, 1943, the date of decedent's death, was $625,000 or $5,000 per share. In the return, the executors did not elect to have the *32 decedent's gross estate valued in accordance with the values as of a date or dates subsequent to the decedent's death, as authorized by section 811 (j) of the Code. At the conclusion of the hearing, respondent asserted a claim for an increased deficiency pursuant to section 871 (e) of the Code, and on leave granted by the Court, filed an answer, claiming an increase of $93,700.58 over the originally determined deficiency, or a total increased deficiency of $359,659.63. The increase is attributable to respondent's position, that based upon the evidence adduced at the hearing, the fair market value on May 4, 1943, of the Smith Company stock was $816,250 or $6,530 per share. Petitioner duly filed a reply in denial of the material allegations in the amended answer. At the beginning of the trial, petitioner, on leave granted by the Court, filed an amended petition in which it claimed an allowance of deductions of additional administrators' expenses, executors' commissions, and attorneys' fees incurred or to be incurred, and to any credit for State estate and inheritance taxes which may be allowable. The parties have agreed that such additional deductions may be appropriately adjusted *33 in the recomputation under Rule 50. In the statutory notice of deficiency involved herein, the sum of $59,024.88 was allowed as a deduction from gross estate on account of the decedent's Federal income taxes paid for the taxable year 1942 and for the period from January 1 to May 4, 1943. On January 2, 1947, petitioner received from respondent a refund in connection with income taxes paid for the year 1942 and for the period from January 1 to May 4, 1943, in the amount of $3,886. The parties have agreed that this amount should be applied against and reduce the total amount of allowable deductions claimed in Schedule K of the estate tax return on account of debts of the decedent and that appropriate adjustments in that respect may be reflected in the recomputation under Rule 50. The parties have also agreed that the 125 shares of Smith Company stock are includible in the decedent's gross estate at its fair market value on May 4, 1943, in such amount as may finally be judicially determined and decided. The sole issue presented is the fair market value of the said 125 shares of stock on May 4, 1943. The estate tax return was filed with the collector of internal revenue for the *34 14th district of New York, at Albany, New York, on August 2, 1944. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly and are included herein by this reference. Anna C. Ewing died May 4, 1943, a resident of Yonkers, Westchester, New York. The decedent's last will and testament was admitted to probate by the Surrogate's Court, Westchester County, New York, which issued letters testamentary on June 9, 1943, to William F. C. Ewing, Sherman Ewing, Gifford C. Ewing, and Bayard Ewing, as executors, who have been and are now representing the estate in such capacity. On the date of death, decedent was owner of 125 shares of the capital stock of Alexander Smith & Sons Carpet Co. (each share having an accompanying scrip certificate). Smith Company, one of the principal manufacturers of wool pile rugs and carpets, is a successor to the original business which was established by Alexander Smith in West Farms, New York, and which, in 1864, was removed to Yonkers, New York, where it has since been located. The present company was incorporated in 1873, taking over the assets of a co-partnership in which Alexander Smith had the principal *35 interest. At the time of the organization of Smith Company, 3,000 shares of capital stock, par value $100 per share, were issued, and very shortly thereafter scrip certificates were issued so that each certificate of stock was accompanied by a certificate of scrip having a face value equal to the par value of the stock. The scrip bore no interest, and was transferable only with an equivalent amount of stock; the scrip had never participated in any distribution of earnings, and was considered a part of the share which it accompanied. Wherever reference is made hereafter to a share of such stock, the scrip which accompanied such share, and had no separate value, is deemed to be included. The capital structure of the company as thus established had on May 4, 1943, remained unchanged. The Smith Co. stock had been closely held from the time of its incorporation to May 4, 1943, and had never been listed on any stock exchange. On May 4, 1943, the descendants and kin of the family of Alexander Smith owned almost 77% of the stock of the company and another 14 1/2% was owned by the Sloane family. The decedent, Anna C. Ewing, was a granddaughter of Alexander Smith, the founder of the business. *36 The Company manufactures axminster, velvet, and wilton carpets and rugs in a wide variation of widths and sizes, as well as of designs and patterns. At the plant in Yonkers the number of employees engaged by the company amounted to 5,936 on December 31, 1940, 6,308 on January 1, 1942, 5,772 on January 1, 1943, and 5,327 on May 5, 1943. From November 1, 1938, to and including May 4, 1943, part of the earnings of Smith Company resulted from a sales agency contract with another manufacturer, C. H. Masland & Sons, Inc., hereinafter referred to as "Masland." Masland manufactured a type of carpet that Smith Company did not make, and the Masland line filled in a gap in Smith Company's production of various types of carpets. The original contract was entered into on November 1, 1938, for a three-year period. At the instigation of Masland, it was amended on April 9, 1941, and June 17, 1941. The amendments related to a reduction of Smith Company's rates of commissions. These changes were set forth in the new contract which was executed November 1, 1941, for another three-year period, ending November 1, 1944. The commissions earned by Smith Company under the contracts were as follows: *37 November 1 to Dec. 31, 1938, $56,767.74; 1939, $344,133.20; 1940, $365,100.56; 1941, $503,192.69; 1942, $597,718.99; and for the first quarter of 1943, $119,120.23. These commissions represented gross income to Smith Company without any reduction on account of any expenses incurred by the company in earning the commissions. The commissions amounted to over 9 per cent of the company's net income before taxes in 1939 and in 1940, over 7 per cent thereof in 1941, over 17 per cent thereof in 1942, and approximately 21 per cent thereof for the first quarter of 1943. Prior to November 1928, Smith Company sold most of its goods by auction sales through its own selling force. From November 1928 to November 1938, it sold through a selling agent, W. & J. Sloane, Selling Agents' Division. Smith Company acquired the Selling Agents' Division from W. & J. Sloane in November 1938, and then handled its own sales. About two-thirds of its products were sold through distributors who, in turn, sold to department stores and other outlets. Twenty to twenty-five per cent was sold through mail order houses, and the balance was sold through the company's own warehouses in localities where there were no *38 distributors. The net sales of Smith Company for the years 1929 to 1942, inclusive, were as follows: 1929
$21,530,000
1930
12,110,100
1931
9,393,000
1932
6,126,000
1933
8,563,000
1934
7,798,000
1935
12,574,000
1936
$17,480,995
1937
19,164,899
1938
14,436,051
1939
21,810,491
1940
23,628,600
1941
33,955,565
1942
32,550,252
The sales in 1941 were the largest in the history of the company. Smith Company's net earnings (or losses) for the years 1928 to 1942, inclusive, and its per share net earnings for said years were as follows: Net Earnings
Year
Net Earnings
Per Share
1928
$ 456,820 $152
1929
704.265 (loss)
235 (loss)
1930
2,297,752 (loss)
766 (loss)
1931
505,275 (loss)
168 (loss)
1932
11,716 (loss)
4 (loss)
1933
648,962
216
1934
118,188
39
1935
856,252
285
1936
898,200
299
1937
562,401
187
1938
125,658
42
1939
2,887,019
962
1940
2,651,703
884
1941
2,857,938
953
1942
1,589,517
530
The surplus of Smith Company as shown on its balance sheets for the years 1936 to 1942, inclusive, was as follows: Dec. 31, 1936
$18,291,270.68
Dec. 31, 1937
18,103,672.33
Dec. 31, 1938
18,229,330.93
Dec. 31, 1939
19,766,350.83
Dec. 31, 1940
21,373,041.31
Dec. 31, 1941
23,030,979.39
Dec. 31, 1942
23,770,497.36
*39 From 1928 to May 4, 1943, inclusive, Smith Company had no bonded indebtedness. Smith Company paid per share dividends on its outstanding capital stock for the years 1928 to 1942, inclusive, as follows: Dividends
Year
Per Share
1928 $400
1929
100
1930
none
1931
none
1932
none
1933
50
1934
250
1935
100
1936
200
1937
250
1938
none
1939
400
1940
400
1941
400
1942
250
For the seven-year period, 1936-1942, inclusive, Smith Company's dividends averaged $271 per share. During World War I and in the years immediately following it, Smith Company paid dividends on its outstanding capital stock. No dividends were declared or paid between January 1, and May 4, 1943. The demand for Smith Company's products is subject to wide fluctuations. The variations in the business are produced by the fact that carpets and rugs are not necessities. People can live without them and in time of business depression they often do. The cyclical nature of the industry is extremely high. The industry is also subject to wide fluctuations in the price of raw materials which are the chief elements in the cost of production. The raw materials approximate about *40 40% of the cost of production. The principal raw material used is wool, then jute, and third cotton yarn. As domestic wool is not suitable for the manufacture of carpets and rugs, Smith Company obtained its wool from foreign sources, such as the Argentine, India, China, Syria, New Zealand, and The British Isles. Its raw jute is imported from India and lower China, and spun in this country. Cotton is obtained from the Southern States of this country. The fluctuations in the price of raw materials cause a lack of stability in the carpet and rug industry. The world markets from which the principal raw materials are bought are somewhat independent of the price structure and conditions of this country. The world prices could be extremely high at a time there were depressed conditions here or vice versa. The company must carry a large investment in raw material inventories, which entail a considerable amount of risk. This is necessary because of the time required to ship the materials from far distant points, and because the production cycle takes three or four months. It is also necessary to carry a large inventory of finished goods as a wide variety of patterns and sizes is required to *41 meet the demands of customers. Smith Company's plant is located near the metropolitan area where there are many other manufacturing industries and which causes much competition for labor. This tends to make labor scarce and expensive as compared with the situation of other competing companies. Labor costs generally amounted to 25 to 30 per cent of the total cost of production of floor coverings, and they increased during the first part of 1943, as compared with 1942, due to a wage increase to all production employees of approximately three cents per hour. When the war started in Europe in 1939, raw materials became scarcer and their prices went continually higher. The cost of cotton rose from 17.55 cents per pound in 1939 to 39.08 cents per pound for the first half of 1943; jute rose from 12.18 cents per pound to 30.41 cents per pound, and wool rose from 23.99 cents per pound to 38.39 cents per pound for the same period. At the same time, shipping and manufacturing costs also increased. In the early part of 1942 the Government restricted the use of jute to 50 per cent of the amount used in 1941. Very shortly thereafter it made another reduction to 25 per cent and about April *42 1942, prohibited entirely the use of jute in the industry. Smith Company was able to produce carpet and rugs in 1943 through the ingenuity of some of its employees who made a yarn substitute for jute. Though the use of cotton was not prohibited, there was an allocation of it to other industries producing war materials so as to make it difficult for the carpet and rug industry to obtain it. Before Smith Company could get into operation on war production, a lot of its employees left for work with other war industries. On January 1, 1942, the Government restricted the consumption of all carpet wools by 50 per cent of the industry's consumption rate during 1941. In February the use of wool was further restricted to 25 per cent of the 1941 consumption, and shortly thereafter the use of wool for carpets was entirely prohibited. Subsequently, there was a restoration of the use of such wool to 50 per cent of the 1941 rate, which was applicable for the period between August 3, 1942, to January 1, 1943. However, during all this time, there was no restriction on the use of wool that was already in process. The limitation forbade putting any further wool in process. On December 10, 1942, the *43 order of limitation was changed, reducing the limit and use of wool to the carpet industry to 25 per cent of the 1941 basic amount, and which was applicable for the three-month period from February 1, 1943, to May 2, 1943, and also for the three-month period from May 3, to July 31, 1943. In December 1941 the prices for rugs and carpets were frozen at the then existing levels. On January 5, 1942, there was a five per cent increase in the prices to cover increases in costs, but no further increase was permitted until after the war. Shortly after the United States entered into World War II, the carpet and rug industry was classified by the War Production Board as "nonessential". The increase in the cost of raw material and the Government's restrictions caused the company's profits to suffer during 1942 and 1943. Smith Co., during the first World War, ceased the production of carpets and rugs and manufactured war products, mainly duck and blankets. During 1940, after the World War II had begun in 1939, the company started experimenting with the making of duck on a carpet loom. It learned that a carpet loom, which is a big, heavy, slow and ponderous piece of equipment, could make *44 duck, but at a slow rate and at a tremendously high cost. In the regular duck industry duck was woven on light, automatic looms, with a weaver operating many looms, which effected a vast difference in the cost of the finished article. Consequently, the company did not receive any contracts for war goods until sometime in March 1942. In the first quarter of 1942 practically 100 per cent of Smith Company's sales were of carpets and rugs. During the first quarter of 1943 more than half of the company's sales were on war business on which the profit was small. The prospect for profits was poor because of the high cost of Smith Co. in making such war products. Smith Co. had the following amounts of inventories of finished goods and work in process on the following respective dates: Record of Inventories of Finished Goods (Carpet and Rugs Only) at Cost Amount of
Finished Goods,
Date
at Cost
Dec. 31, 1938
$3,610.560.93
Dec. 31, 1939
3,903,926.15
Dec. 31, 1940
5,408,682.58
Dec. 31, 1941
4,981,464.00
Dec. 31, 1942
1,025,646.00
Apr. 30, 1943
651,997.46
Record of Work-in-Process (Carpets and Rugs Only) Date
Amount at Cost
Dec. 31, 1941
$2,811,011.53
Dec. 31, 1942
2,079,656.13
Apr. 30, 1943
1,894,340.43
*45 The profit and loss statement of Smith Co. for the first quarter of 1943 shows the net income of the company for that period to be $197,243.15. The company's auditors in 1945, in the light of late knowledge, prepared a revised statement, setting forth the allocations of income and restatement of taxes for the first three months of 1943, showing the adjusted net income to be $340,448.19. The net income for the first quarter of 1942 of $1,004,943.13 represented 9.35% of the net sales during that period. Advertising expenses were less in the first quarter of 1943 as compared with those in the first quarter of 1942. The operating profit for the first quarter of 1943 represented 4.4% of net sales, while it was 8.2% for the whole year of 1942. In the first quarter of 1943 the adjusted net income, after taxes, of $340,448.19, included Masland commissions of $119,120.23, and represented 3 1/2% of the sales for that quarter, but the Masland sales were not included in the total sales used to compute that percentage. Smith Co., during the first quarter of 1943, received a $3 per share dividend on the preferred stock it held in Sloane-Blabon Co. The net income of Smith Co., before taxes and *46 adjustment, for 1942 was $3,145,549 less than it was in 1941, a decline of 47.8 per cent. After adjustment, the decline in net income before taxes for 1942, as compared with 1941, was $3,566,420, a decline of 51.3 per cent. Smith Company's balance sheet and statement of income and surplus for the first quarter of 1943 are as follows: ALEXANDER SMITH & SONS CARPET COMPANY (New York) BALANCE SHEET, March 31, 1943 ASSETS
Deposits in banks and cash on hand
$ 4,387,118.11
United States Treasury Notes, Tax Series A, B and C
2,705,000.00
Accounts and notes receivable: Customers
$ 3,165,525.55
Other accounts receivable
112,812.86
$ 3,278,338.41
Less, allowances for discounts, bad debts, etc.
572,096.39
$ 2,706,242.02
Accrued interest receivable on mortgages and other securities
23,653.26
2,729,895.28
Inventories, at the lower of cost or market: Raw materials and supplies
$ 4,158,724.73
Yarn, wool and other materials in transit
98,752.28
Work in process
3,408,377.26
Finished goods
1,867,869.25
9,533,723.52
Total current assets
$19,355,736.91
Federal and city bonds, at cost, deposited with and registered in the
name of the New York State Industrial Commissioner as guaranty
for performance under New York State Workmen's Compensation
Law, par value $161,000
$ 166,058.11
United States Treasury Bonds, 2 1/2 per cent, 1962-1967, deposited
with National Surety Corporation, New York, as security for bond
given to War Shipping Administration guaranteeing premiums due
under open war risk policy, $50,000 par value, at cost
50,203.13
United States Defense Bonds, Series F, due July, 1954, $50,000, at
cost
37,000.00
253,261.24
Post-war refund of federal excess profits tax, estimated
69,000.00
Investments in stocks of domestic corporations: Sloane-Blabon Corporation (at amount assigned by company
officers)
$ 741,968.65
Investments in other stocks
25,040.03
767,008.68
Mortgages and notes receivable, at cost
154,477.49
Claims against closed banks in liquidation
$ 118,602.89
Less, allowance for possible loss thereon
118,602.89
Plant and equipment (depreciable property stated at amounts used
for federal income tax purposes): Land
$ 675,438.87
Buildings
$ 4,296,338.09
Machinery and equipment
12,950,877.97
Tenements
449,560.74
$17,696,776.80
Less, allowance for depreciation and amortization
of war facilities
10,451,089.62
7,245,687.18
New construction in process
324,887.45
8,246,013.50
Trade-marks and patents
1.00
Prepaid expenses and deferred charges
353,012.98
$29,198,511.80
LIABILITIES
Trade and other accounts payable
$ 1,160,071.63
Accrued items: Federal income and excess profits taxes, estimated
$ 2,01,.241.58
Federal capital stock and state franchise taxes
273,587.44
Real estate, personal property and pay roll taxes
206,454.13
Salaries, wages and commissions
634,134.55
3,130,417.70
Liability for uninsured workmen's compensation claims and awards
111,662.72
Total current liabilities
$ 4,402,152.05
Reserves: For workmen's compensation claims and awards
$ 150,000.00
For post-war cost of changing from war to peacetime production
100,000.00
For general contingencies arising out of war conditions, and
other losses or contingencies
101,165.36
351,165.36
CAPITAL
Capital stock, authorized and issued 3,000 shares, par value $100
each
$ 300,000.00
Scrip certificates, par value $100 each (redeemable at par; not en-
titled to interest or dividends)
300,000.00
Surplus, per annexed statement
23,845,194.39
24,445,194.39
$29,198,511.80
*47 STATEMENT OF INCOME AND SURPLUS Three Months Ended March 31, 1943 Sales, less returns and allowances
$10,151,582.47
Less, cash and special discounts
501,223.52
Net sales
$ 9,650,358.95
Cost of goods sold
8,665,983.44
Gross profits on sales
$ 984,375.51
Commissions earned as sales agent
119,120.23
$ 1,103,495.74
Selling and administrative expenses: Warehouse and shipping expenses
$ 77,871.00
Sales department salaries and commissions
222,451.27
Advertising
29,126.62
Other selling expenses
29,954.30
Provision for bad debts
11,000.00
General and administrative expenses
184,654.01
555,057.20
Operating profit
$ 548,438.54
Other income
23,230.98
$ 571,669.52
Other deductions
4,255.87
$ 567,413.65
Provision for federal income taxes
226,965.46
Net income added to surplus
$ 340,448.19
Surplus, adjusted balance, December 31, 1942
$23,770,497.36
Deduct: Additional provision for federal income taxes for
prior years $219,751.16
Adjustment of estimated post-war refund of fed-
eral excess profits tax 46,000.00
265,751.16
23,504,746.20
Balance, March 31, 1943
$23,845,194.39
On April 11, 1933, 39 *48 shares of the stock of Smith Co. were sold through a brokerage firm by Walter W. Law, Jr., a son of a former partner of W. & J. Sloane Co., to the following persons and in the following number of shares for $1,282.50 per share: Maitland Griggs 10 shares; Richard J. Edie 10 shares; Wm. F. C. Ewing 12 shares; Harry M. Zuckert 7 shares. The purchasers, at that time, were either officers, directors, or otherwise connected with the Smith Company. On December 15, 1937, 10 shares were sold by the Greenwich Trust Co., as successor trustee for Robert Irving Von Schuckman, to Harry M. Zuckert, acting for himself, with respect to 3 shares, for Frederick B. Klein, with respect to 5 shares, and Robert P. Ridges with respect to 25 shares at a price of $2,500 per share. These purchasers were then officers or directors of Smith Co. On September 7, 1938, 120 shares were sold through the Adrian H. Muller & Son auction rooms in New York City by the executors of the Estate of Henry T. Sloane to the testamentary trustees of the estate at a price of $2,015 per share. The facts relating to said sale were set forth in the Tax Court's findings of fact in its memorandum decision entered on June 8, 1944, in *49 the Estate of Henry T. Sloane, Deceased, John Sloane and Roland L. Redmond, Executors (Docket No. 108473) [3 TCM 555]. In accordance with the stipulation of the parties, the said findings of fact relating to the sale are incorporated herein by reference and made a part hereof. On September 28, 1938, 35 shares of the company stock were sold through the Adrian H. Muller & Son auction rooms in New York City by Martha Law Kerr, a daughter of Walter Law, who was a former partner in W. & J. Sloane Co., to Harry M. Zuckert, acting as attorney for Frederick B. Klein, at a price of $2,000 per share. On the date of sale, Klein was president and a director of Smith Co. On November 20, 1940, five shares of the stock were sold through the aforesaid auction rooms by Alston Beekman, executor of the Estate of Helen C. Smith, Deceased, who was the widow of a great nephew of Alexander Smith. The purchaser was Harry M. Zuckert, acting as attorney for Frederick B. Klein, Maitland L. Griggs, Wm. D. Gardner, W. F. Cochran, Jr., and Drayton Cochran, each of whom purchased a single share at a price of $2,700 per share. The purchasers were officers or directors of Smith Co. On July 21, 1941, 10 *50 shares of stock were sold by Theodore Gilman Law, executor of the Estate of Henry H. Law, Deceased, who was the son of Walter W. Law, a former partner of W. & J. Sloane Co., to Gifford C. Ewing for $2,500 per share. The purchaser was a brother of Wm. F. C. Ewing, vice-president of Smith Co., and a brother of Sherman Ewing, a director of the company. The seller and buyer were both represented by attorneys. On November 27, 1941, 10 shares of the stock were sold by the Superintendent of Banks of the State of New York, as liquidator of the Westchester Trust Co., to Wm. D. Gardner for $3,000 per share. Gardner retained 2 shares and sold or "distributed" the remaining 8 shares to Robert P. Ridges, Frederick B. Klein, Maitland L. Griggs, and W. C. Hammel at the same prices. All of the purchasers were officers or directors of the company except Hammel, who was an employee. The 10 shares had originally been acquired by the Westchester Trust Co., or the Superintendent of Banks of the State of New York as its liquidator, through foreclosure proceedings. Beginning with the year 1936, condensed balance sheets and profit and loss statements of Smith Co. had been sent annually to the liquidator *51 in response to his inquiries, and the latest statements consisting of the company's balance sheet as of the end of 1940, and profit and loss statement for that year, were furnished to him in May, 1941. There were no sales of Smith Co. stock between the dates of Nov. 27, 1941, and May 4, 1943. The Bigelow-Sanford Carpet Co. (hereinafter referred to as Bigelow-Sanford), and the Mohawk Carpet Mills (hereinafter referred to as Mohawk), are engaged in the same line of business as Smith Co. These three companies constitute the leading carpet manufacturing companies and they have been long established. Their similarity is unusually close. On May 4, 1943, and for many years prior thereto, they represented a comparable, comprehensive and diversified line. They spun their own wool yarn and operated their own dyeing facilities. Their manufacturing properties were located in the northeastern section of the country. Each enjoyed substantial continuity of management. From 1929 to 1942, inclusive, the sales of Smith Company's products varied from 24% to 34% of the total sales of the three companies. In 1941 and 1942 the Smith Co. sales represented 33% and 31%, respectively, of the total sales *52 of the three companies. The balance sheets of the three companies as of December 31, 1941, and December 31, 1942, showed great similarity of financial position and the overall composition of their net worth. There was great similarity between the companies with respect to the relationship of current assets to current liabilities, proportion of net worth represented by inventory, and the proportion of net worth by fixed assets. The capital structure of each of the three companies was very similar, the capital of Smith Co. and Mohawk being comprised solely of common stock, whereas Bigelow-Sanford had only a relatively unimportant issue of preferred stock. There was a close similarity between the three companies in the percentage of receivables to sales, and in the percentage of inventories to sales. From 1925 to 1942, inclusive, the sales and earnings history of Smith Co., Bigelow-Sanford and Mohawk showed remarkably similar fluctuations. All three companies suffered severely from the depression, including depressed conditions in 1938, whereas all three benefited from the expansion in public buying power in 1939, 1940, and 1941. Each sustained a substantial drop in earnings in 1942. *53 They were similarly affected by price fluctuations in raw materials, and by restrictions on the supply of raw materials caused by the war in Europe. After the entry of the United States into World War II, all three companies were subject to the limitations imposed by the War Production Board. Likewise, they were affected by the price ceiling on finished carpets fixed by O.P.A. The book values per share of Smith Co. (3,000 shares), Bigelow-Sanford common (313,609 common and 26,403 shares preferred), and Mohawk (542,000 shares and 531,000 shares in 1941 and 1942, respectively), for the years 1937 to 1942, inclusive, were as follows: Bigelow-
Year
Smith
Sanford
Mohawk
Dec. 31, 1937
$6,234.55
$65.85
$30.61
Dec. 31, 1938
6,276.44
60.84
27.64
Dec. 31, 1939
6,788.78
62.85
28.36
Dec. 31, 1940
7,324.34
65.96
30.10
Dec. 31, 1941
7,876.99
67.98
31.76
Dec. 31, 1942
8,123.50
69.50
33.18
The net current assets (working capital) per share of Smith Co., Bigelow-Sanford, and Mohawk at the end of the years 1941 and 1942 were as follows: Bigelow-Sanford
(After deducting
Year
Smith
preferred stock)
Mohawk
1941
$4,650.00
$41.00
$23.00
1942
4,886.00
45.00
25.00
*54 A comparison between the first quarter of 1943 and the December 31, 1942, asset and liability accounts of Smith Co. and Bigelow-Sanford (no figures are available for Mohawk) shows the following increases or decreases at the end of the first quarter of 1943: Smith Co.
Bigelow-Sanford
Total current assets
$ 47,739 (Decrease)
$381,862 (Decrease)
Total assets
263,521 (Decrease)
457,812 (Decrease)
Total current liabilities
344,262 (Decrease)
257,316 (Decrease)
Net current assets (Working capital)
296,523 (Increase)
124,546 (Decrease)
The first quarter of 1943, operating results of Smith Co. and Bigelow-Sanford (no figures available for Mohawk) were as follows: Smith Co.
Bigelow-Sanford
Net sales
$9,650,358.95
$8,668,807.00
Gross profit
984,375.51
722,721.00
(10.2% of net sales)
(8.3% of net sales)
Operating profit
548,438.54
(18,875.00) Deficit
Net income (Before Fed. taxes)
567,413.65
(65,337.00) Deficit
Net income (After Fed. taxes)
340,448.19
(65,337.00) Deficit
Sixty-five hundred shares of Mohawk stock were traded in on the New York Stock Exchange in September, October, and November, 1942. On November 2, 1942, the *55 per share prices ranged from $17.25 and $17.625, and on November 4, 1942, $17.50 bid and $18 asked. As of November 3, 1942, the selling price of the stock is taken to be $17.50 per share. On May 4, 1943, 900 shares of Bigelow-Sanford common stock were traded in on the New York Exchange at prices ranging from $36.25 and $38.125 per share. The average selling price was $37.1875 per share. On May 4, 1943, 700 shares of Mohawk stock were traded in on the New York Stock Exchange at prices ranging from $25.50 to $26 per share. The average selling price was $25.75 per share. During the first quarter of 1942 the net sales of Smith Co. and Bigelow-Sanford were respectively $10,748,112.80 and $13,402,865, and for the first quarter of 1943 they were respectively $9,650,358.95 and $8,668,807. The decline in net sales for the respective companies in the first quarter of 1943 over the first quarter of 1942 shows Smith Co. at 11% and Bigelow-Sanford at approximately 35%. Smith Company's volume of net sales was approximately 10% greater than the net sales of Bigelow-Sanford during the 1943 quarter. Smith Co. valued its inventories on the basis of lower cost or market. Bigelow-Sanford used *56 the last-in first-out method. Mohawk used the last-in first-out method for valuing carpet wool inventories, and the first-in first-out method for valuing remaining inventories. Twelve thousand, eight hundred shares of Bigelow-Sanford common stock were traded in on the New York Exchange during October, November, and December, 1941. On December 19, 1941, the average selling price of such stock was $24.50 per share. Sixty-five hundred shares of Bigelow-Sanford common stock were traded in on the New York Stock Exchange in September, October, and November, 1942; November 3, 1942, was a holiday. The per-share price on November 2 was $25.50; on November 4, $26 bid and $28 asked; and on November 5, $25.50 and $25.75. The selling price of the stock on the exchange as of November 3, 1942, is taken to be $25.50 per share. Bigelow-Sanford preferred stock, dealt in on the Boston Stock Exchange, showed no sales in the week of December 19, 1941, but in the previous week had been traded in at $106, and in the subsequent week at $105.75 to $106 per share. The closest sales of such preferred stock in 1942 were in the week ending October 23 at $103, and in the week ending November 13 at $103.50 *57 to $104 per share. Fourteen thousand, four hundred shares of Mohawk stock were traded in on the New York Stock Exchange in October, November, and December, 1941. On December 19, 1941, the selling prices ranged from $13 to $13.395 per share. The average selling price on that date was $13.1875 per share. The fair market value of the 125 shares of Smith Co. stock, with accompanying scrip, on May 4, 1943, was $4,750 per share, or a total of $593,750. Opinion KERN, Judge: The only question for determination is the fair market value, on May 4, 1943, of the 125 shares of Smith Company stock, with accompanying scrip, for the purpose of ascertaining the amount of the estate tax due. Respondent contends that the evidence shows the fair market value of the stock at the critical date is $6,530 per share, an increase over his determination of $5,000 per share. Petitioner contends that the fair market value of the stock on the aforesaid date is $3,936.83 per share, an increase over the amount of $2,400 per share as reported in the estate tax return. From an analysis of the respective opinions of the expert witnesses and from a consideration of all the evidence bearing on the value *58 of the 125 shares of the Alexander Smith & Sons Carpet Co. stock, with its accompanying scrip, owned by the decedent, including all the factors set forth in the statute and the regulations, we are of the opinion that the stock had a value on May 4, 1943, of $4,750 per share, or a total of $593,750, and have so found as a fact. As there are several matters to be adjusted, Decision will be entered under Rule 50.